UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| WILLIAM OWEN, | ) | CIV. 07-4014-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM OPINION |
| vs. | ) | AND ORDER |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

Plaintiff, William Owen, contends that the medical care he received at the Indian Health Services Hospital in Sisseton, South Dakota, in July and August 2001 fell below the standard of care, which caused him to sustain permanent impairment of his bladder, bowel, and sexual function. Defendant, the United States, denies the allegations. After considering the evidence admitted during a two-day court trial, the court determines by a preponderance of the evidence the following facts and reaches the following conclusions of law.

I.     **Parties**

Plaintiff, William Owen, is an enrolled member of the Sisseton-Wahpeton Sioux Tribe who lives in Peever, South Dakota. Tr. 56; Ex. 101, USA 392. He lives with his fiancee, Jacqueline Red Wing, and their three children. Tr. 12-14, 56. Owen and Red Wing were married from 1993 until 2003. Tr. 12-13.

They divorced in 2003, but got back together later that year and are currently engaged to be married.  Tr. 12-13.  In July and August 2001, their children were three years old and eleven months old.  Tr. 19.  Their youngest child was born in May 2005.  Tr. 14.

Owen served in the Marine Corps for four years.  Tr. 29, 56-57.  Shortly after being discharged, Owen began working in the law enforcement field.  Tr. 58.  He has worked for Sisseton-Wahpeton Law Enforcement and the Standing Rock Sioux Tribe.  Tr. 58.  He started his current position with Sisseton-Wahpeton Law Enforcement in January 2000.  Tr. 58.

Owen sought medical treatment for severe back and leg pain and related symptoms at the Indian Health Services hospital in Sisseton (IHS hospital) in July and August 2001.  He was eventually diagnosed with cauda equina syndrome and underwent emergency back surgery at MeritCare Hospital in Fargo, North Dakota, on August 2, 2001.  Owen suffered previous back injuries in 1996 and 2001.  Tr. 52, 89.  Owen weighed about 300 pounds in July and August 2001.  Tr. 62.  He underwent gastric bypass surgery in 2005 and lost about 120 pounds.  Tr. 62-63.

Defendant, the United States, is sued in the place of Dr. Donald D. Weiffenbach, an emergency room physician at the IHS hospital, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 1346(b)(1).  Dr. Weiffenbach treated Owen from July 22, 2001, to August 1, 2001.  Ex. 1, USA 403A.

Dr. Weiffenbach was practicing at the IHS hospital through the Project U.S.A. program under which physicians provide medical services on American Indian reservations for one to two weeks at a time. Dep. Tr. 15-16. Dr. Weiffenbach was placed in Sisseton for a few weeks in 2001. Dep. Tr. 16. He is currently retired from the practice of medicine and does not remember seeing or treating Owen. Dep. Tr. 14, 16.

## II.     Events in July and August 2001

This case arises out of the medical treatment Owen received at the IHS hospital from July 22, 2001, to August 2, 2001, when he was transferred by ambulance to MeritCare and diagnosed with cauda equina syndrome. By way of background, cauda equina syndrome is the name for dysfunction of the cauda equina. Tr. 284-85. The phrase "cauda equina," Latin for "horse's tail," refers to the nerves in the lower back that begin where the spinal cord ends, at L1.[1] Tr. 115-16. These nerves project downward from the end of the spinal cord and into the legs, buttocks, thighs, perineum or saddle area (which includes the scrotum, testes, and penis in males), and rectal sphincter. Tr. 116. The remnants of these nerves control the functioning of the bladder and penile and vulvar sensation and activity. Tr. 116. The most common symptom

_____

[1] Consistent with medical terminology, the court will refer to the lumbar nerves as "L_." For example, L1 refers to the first lumbar nerve. Similarly, the court will refer to the sacral nerves as "S_," where S1 refers to the first sacral nerve.

of cauda equina syndrome is urinary retention, but cauda equina syndrome can also cause bowel and bladder incontinence, perineal sensory loss, bilateral leg pain, weakness, numbness, and sexual dysfunction.  Tr. 285.  Cauda equina syndrome is a neurosurgical emergency.  Tr. 285.

### A.    July 22, 2001

Owen first presented at the IHS hospital emergency room at 11:09 a.m. on Sunday, July 22, 2001, where he was seen by Dr. Weiffenbach.  Ex. 1, USA 403A.  Owen complained of back pain, leg numbness, and leg pain.  Id.  Owen told Dr. Weiffenbach that the pain radiated down to his right foot and that it was difficult to lift his right foot.  Id.  Dr. Weiffenbach observed "[d]ifficult flexion, somewhat weak dorsiflexion of right foot."  Ex. 1, USA 403A. Dr. Weiffenbach testified that "dorsiflexion" means to pick up the foot at the ankle.  Dep. Tr. 38.  He testified that weak dorsiflexion indicates that there is some pressure on the nerve, but he could not identify which nerve was affected.  Dep. Tr. 39.

Dr. Weiffenbach assessed Owen's condition as "L-S [lumbosacral] strain and radiculitis."  Ex. 1, USA 403A.  Dr. Weiffenbach testified that radiculitis means inflammation of the nerve.  Dep. Tr. 21.  Dr. Weiffenbach prescribed analgesic and muscle relaxant medications.  Dep. Tr. 21; Ex. 1, USA 403A. Owen was also told not to work that week and to return to the clinic in one week.  Tr. 78; Ex. 1, USA 403A.

Dr. Weiffenbach testified that back pain was one of the most common complaints he saw as an emergency room physician.  Dep. Tr. 21.  Usually, back pain would resolve itself with time and that the patient should not do anything to aggravate it.  Dep. Tr. 22.  If a patient had ongoing back pain, Dr. Weiffenbach would order an MRI or a myelogram.  Dep. Tr. 22.

**B.    July 27, 2001**

Owen went back to the IHS hospital twice on Friday, July 27, 2001: first at 12:27 a.m. and then again at 9:31 a.m.  Ex. 1, USA 340A; Ex. 1, USA 404A.

**1.    12:27 a.m.**

Owen presented to the emergency room at 12:27 a.m. complaining of lower back pain with right leg pain and numbness.  Ex. 1, USA 404A.  He had run out of Motrin, an analgesic, and Robaxin, a muscle relaxant.  Id.  The emergency room nurse observed that Owen ambulated with a severe limp.  Id.  Dr. Weiffenbach was not present at the IHS hospital, but the nurse contacted him and received instructions for Owen's care.  Dep. Tr. 23-24.  Dr. Weiffenbach ordered the nurse to administer injections of 50 milligrams of Demerol and 50 milligrams of Phenergan and to instruct Owen to come back for a follow-up appointment with Dr. Weiffenbach at 9:15 a.m. the same day.  Ex. 1, USA 404A.

## 2. 9:31 a.m.

Owen returned to the IHS hospital at 9:31 a.m. the same day.  Ex. 1, US 340A.  He complained of pain going down his right leg, starting in his right buttock.  Id.  Dr. Weiffenbach observed that Owen was sitting in a chair, splinting, but was able to walk.  Id.  Dr. Weiffenbach wrote "no footdrop," but there is no notation of any tests or examinations.  Id.  Dr. Weiffenbach diagnosed Owen as having sacroiliac pain with radiculitis.  Ex. 1, USA 340A.  He ordered an x-ray of the lumbosacral spine[2] and a request for an MRI.[3]  Id.  Dr. Weiffenbach also prescribed analgesics and muscle relaxants and advised Owen to return to the clinic in one week.  Id.

## C. July 28, 2001

Owen returned to the emergency room of the IHS hospital at 11:48 a.m. on Saturday, July 28, 2001, complaining of pain or weakness of his right leg and pain in his back.  Ex. 1, USA 405; see also Tr. 166.  He reported that the pain was in the hamstring area of his leg.  Ex. 1, USA 405.  Owen indicated

_____

[2] An x-ray was taken on July 27.  The findings were, "[d]isc space narrowing at L3-4, L4-5 and L5-1 with small anterior and lateral osteophytes." Ex. 1, USA 412.  The expert witnesses did not testify about the findings of the x-ray, and there is no indication in the IHS records that Dr. Weiffenbach reviewed the x-ray.  The court cannot interpret the results of the x-ray without the benefit of testimony from a physician, so the court finds that the x-ray taken July 27 is not relevant to the determination of the issues in this case.

[3] Two weeks after Owen had surgery at MeritCare, he received a letter from IHS indicating that his request for an MRI was denied.  Tr. 30; see also Ex. 1, USA 429 (letter from IHS).

that his pain was "off the chart" when he moved.  Id.  Owen saw Dr. Cropp, rather than Dr. Weiffenbach, who prescribed medication and advised Owen to keep his MRI appointment, begin physical therapy, and return to the clinic in one week.  Id.

### D.    July 31, 2001

On Tuesday, July 31, 2001, Owen drove himself to Watertown, South Dakota, to get a massage.  Tr. 41.  He decided to get a massage because he had experienced pain in the buttock area before, and getting a massage helped on that occasion.  Tr. 71.  Owen received a full body massage, and the therapist used a soft touch on his head, neck, shoulders, back, and sides.  Tr. 109.  Owen does not remember having bowel or bladder dysfunction at the time of the massage.  Tr. 93.  Owen also drove himself home from the massage.  Tr. 85.  He used his right foot on the gas pedal and his left foot on the brake.  Tr. 85.  When Owen got home from the massage, he heard a "crack" or "pop" sound in his buttock.  Tr. 70.  He did not feel any sensation associated with the sound.  Tr. 109.

### E.    August 1, 2001

#### 1.    Morning

The next morning, Wednesday, August 1, 2001, Owen and Red Wing got out of bed and Owen almost fell.  Tr. 22.  He also urinated on himself.  Tr. 22.

It was the first time Owen had urinated on himself and the first time he noticed problems with his bowel and urinary functions.  Tr. 22, 95.

## 2.    IHS Hospital–7:59 p.m.

That evening, Red Wing drove Owen to the IHS hospital.  Tr. 23.  He presented at 7:59 p.m.  Ex. 1, USA 406.  Red Wing walked beside Owen from the car to the hospital, but Owen was able to walk into the clinic without assistance.  Tr. 23.  Owen had one of his children's diapers over his groin area because he was urinating on himself.  Tr. 24, 75.  Owen felt pain in his abdomen/belly button area.  Tr. 75.  Owen does not remember whether he still had the diaper over his groin area when Dr. Weiffenbach saw him.  Tr. 76.

Owen complained of pain in his right buttock down his right leg, right leg numbness, and inability to void.  Ex. 1, USA 406.  Dr. Weiffenbach recorded that Owen's symptoms were variable and had been going on for one week and three days.  Id.  Dr. Weiffenbach observed that Owen was alert and oriented, and at times appeared to be in pain.  Id.  Dr. Weiffenbach also observed that Owen's numbness varied from place to place.  Id.  Dr. Weiffenbach's diagnosis was, "Sciatica?"  Id.  He testified that he really did not understand what the problem was and that Owen needed to be further investigated by a neurologist. Dep. Tr. 29.  To Dr. Weiffenbach, sciatica means hip and leg pain of an unknown etiology.  Dep. Tr. 43.  Dr. Weiffenbach did not conduct an examination on Owen or touch Owen in any way.  Tr. 74.  Dr. Weiffenbach

instructed Owen to return to the clinic the next morning to plan a referral to a neurologist.  Ex. 1, USA 406.  He noted that Owen had not gotten an MRI yet, and he told Owen to come back in the morning to chase some paperwork for the test.  Id.; Tr. 27-28, 74.  Owen asked Dr. Weiffenbach, "What am I supposed to do?  Go home and pee on myself."  Tr. 49, 77.  Dr. Weiffenbach said something to the effect of "Yeah, if that's what has to happen."  Tr. 28, 49, 77.

Dr. Weiffenbach testified that he did not catheterize Owen because catheterization created a risk of infection.  Dep. Tr. 31.  He testified that if a person is passing urine, catheterization is done for sanitary reasons only.  Dep. Tr. 31.  Dr. Weiffenbach did not transfer Owen to a treating facility immediately because most IHS hospitals require approval before transferring patients except in bona fide emergency situations.  Dep. Tr. 31-32.  Owen's situation was an urgency, but not an emergency.  Dep. Tr. 32.  According to Dr. Weiffenbach, an emergency is something that a physician has minutes to correct while an urgency is something a physician has hours or days to address.  Dep. Tr. 44.  In 2001, most hospitals were not equipped to perform MRIs in the middle of the night.  Dep. Tr. 32.

### 3. Coteau Des Prairies Hospital–10:45 p.m.

After leaving IHS, Red Wing talked Owen into going to Coteau Des Prairies Hospital in Sisseton because Owen was frustrated, upset, and let down

over the care he received at the IHS hospital.  Tr. 30-31.  Owen presented at the Coteau emergency room at 10:45 p.m.  Ex. 1, USA 11A.  At Coteau, Owen reported that he had gotten a massage the day before and heard a crack in his buttock when he got home.  Id.  Ever since then, he had had no urine or bowel function.  Id.

Owen was examined by Dr. Van Peursem at Coteau.  Dr. Van Peursem asked Owen questions and conducted reflex tests on Owen's knee and ankle and sensation tests on his leg and foot.  Tr. 31; Ex. 1, USA 11A.  She also performed a rectal exam and reported that there was no sensation on exam and no anal wink.  Id.  This was the first time anyone had given Owen this type of exam.  He did not receive a rectal exam at IHS.  Tr. 70.  Dr. Van Peursem also indicated that Owen dragged his foot.  Id.  Owen was catheterized at Coteau.  Tr. 73.  One thousand cubic centimeters (cc's) of urine was removed immediately.  Ex. 1, USA 11A.  His bladder had a total of 1,200 to 1,500 cc's of urine in it.  Ex. 101, USA 86.

Based on these examinations, Dr. Van Peursem suspected L5/S1 nerve injury.  Id.  She called Dr. Weiffenbach and told him that Owen needed to be evaluated and transferred to MeritCare for an MRI and lumbosacral spine and orthopedic referral.  Id.

### 4. Return to IHS for Ambulance

After Dr. Van Peursem examined Owen, Owen was directed to return to the IHS hospital. Tr. 72. Red Wing drove him from Coteau to the IHS hospital so that Owen could be transported by ambulance to Fargo. Tr. 32. While Owen was waiting to be placed in the ambulance at IHS, Dr. Weiffenbach told Owen that they were getting the paperwork ready for Owen to be transferred to Fargo for emergency surgery. Tr. 80. This was the first time Owen heard Dr. Weiffenbach refer to Owen's situation as an emergency, talk about sending him to Fargo, or talk about Owen needing to have surgery. Tr. 80. The ambulance departed the IHS hospital at 12:48 a.m. on August 2, 2001, and arrived at MeritCare at 2:19 a.m. Ex. 1, USA 114.

### F. August 2, 2001

After Owen arrived at MeritCare, a series of tests were performed between 3:15 a.m. and 6:45 a.m. Ex. 101, USA 83. An MRI was attempted, but Owen did not fit into the MRI machine. Tr. 103; Ex. 101, USA 87. A CT of Owen's spine showed a lesion at the L4-5 level. Ex. 101, USA 87. Finally, Owen had a myelogram, which showed a complete stenosis of the spinal canal at the L4-5 level. Tr. 162; Ex. 101, USA 87. Upon examination of Owen's motor strength, hip flexion, knee extension, knee flexion, dorsiflexion, big toe dorsiflexion, plantar flexion, and rectal sensation and tone, a neurosurgeon diagnosed Owen

as having cauda equina syndrome which was at least thirty-six hours old.  Ex. 1, USA 89-USA 90.

Owen had a decompressive laminectomy at L4-5.  Tr 162; Ex. 101, USA 95-97.  The surgery began at 2:15 p.m.  Ex. 101, USA 117.  The purpose of this type of surgery is to provide space in the spinal canal and to remove the disc fragment that is bulging into the canal in order to remove the pressure from the nerves.  Tr. 162.

III. **Harm and Injuries**

A. **Wages and Medical Expenses**

Owen did not sustain lost wages after his surgery.  He returned to work after being discharged from MeritCare.  He worked dispatch for about two months before returning to patrol, but earned the same salary in both positions.  Tr. 87.  Owen also did not incur medical expenses as a result of his treatment in July and August 2001 because IHS paid for all of the expenses associated with his treatment and surgery.  Tr. 84.

B. **Residual Injuries**

Owen has not fully recovered from his cauda equina syndrome.  He remains numb from the waist down, except that he has regained sensation in the front big toe, and second toe of his right leg.  Tr. 107.  He has also lost bladder, bowel, and sexual function.

### 1.    Bladder Function

Owen has lost normal bladder function.  Dr. Sabow testified that Owen's loss of bladder function resulted from the overdistention of his bladder.  A normal adult male bladder holds between 400 and 500 cc's of urine.  Tr. 176.  From Dr. Sabow's reading of the medical records, between 1,250 and 1,500 cc's of urine were removed from Owen's bladder the night of August 1.  Tr. 175.  Dr. Sabow testified that a bladder that is stretched to two-and-a-half to three times its normal size will never return to its normal size or regain normal contractile, or detrusor, function.  Tr. 176-77.

Before being discharged from MeritCare, Owen was taught to catheterize himself.  Tr. 59.  He had to self-catheterize for six months so that he would not urinate on himself.  Tr. 33.  Owen no longer needs to catheterize himself, but still does not have normal bladder sensation.  Tr. 60.  Owen does not feel urges that tell him he has to urinate.  Tr. 61.  He knows he needs to urinate when he feels pressure in his lower abdomen caused by his bladder being full of urine.  Tr. 60.  Owen is able to pass urine by pushing and contracting his abdominal muscles, as if he is doing a sit-up.  Tr. 61.  He does not feel a sensation that he is done urinating, but assumes that he is finished when he continues to push and nothing comes out.  Tr. 61.

Dr. Sabow explained that the pressure Owen feels is overdistention of his bladder within the confines of his abdomen, meaning that his bladder is

putting pressure on the other organs in the area. Tr. 178. When Owen empties his bladder, he does so by creating intraabdominal pressure rather than through detrusor muscular function. Tr. 179. This technique leaves about 200 to 400 cc's of urine in the bladder. Tr. 179.

Dr. Sabow also testified that Owen will continue to lose bladder functioning as he grows older. Tr. 179-80. As Owen's prostrate becomes enlarged, which happens to males as they age, he will achieve much less expression of urine through the intraabdominal pressure technique. Tr. 180. The remaining urine in the bladder can lead to dilation of the tubes going from the bladder to the kidneys, which leads to hydronephrosis and infected cysts inside the kidneys. Tr. 180. Thus, Dr. Sabow believes that Owen will develop kidney problems in the future. Tr. 180. Dr. Sabow also testified that Owen's bladder problems are permanent. Tr. 190.

### 2. Bowel Function

Owen has also lost normal bowel function. He was unable to control his bowel functions for about six months after the surgery. Tr. 62. He soiled his pants while on patrol and while wearing his police uniform several times. Tr. 34. Red Wing had to help him clean up the seat of his police car. Tr. 34, 48. About six months after his surgery, Owen stopped soiling his pants. Tr. 47-48. He still has no sensation with his bowels. Tr. 64. He does not feel a sensation that he needs to defecate, but he knows he needs to when he cannot pass gas

14

anymore.  Tr. 63-64.  Owen uses the same technique to pass a bowel movement that he does when he urinates; he uses his abdominal muscles to push, and when nothing else comes out, he assumes he is done.  Tr. 64.

Dr. Sabow testified that while Owen's bowels have an intrinsic fiber complex that moves a formed stool from the mid transverse colon towards the rectum, his bowels do not have the normal coordinated peristaltic movement. Tr. 181.  Therefore, Owen probably holds a fair amount of stool within his colon without it ever being expressed with a normal movement.  Tr. 181.  The holding of stool within the colon can lead to mega colon, which increases the chances for diverticulitis, or the development of small outpouchings of the colon in which small amounts of feces collect.  Tr. 181.  Constipation and significant hemorrhoids are also likely.  Tr. 181-82.  Dr. Sabow testified that Owen's bowel problems are permanent.  Tr. 190.

Dr. Sabow testified that loss of bowel or bladder function is a source of chronic anxiety.  Tr. 189.  Patients with these conditions are often reluctant to participate in certain events or travel because they do not know when they will have to relieve themselves or if there will be a bathroom available.  Tr. 190.

### 3. Sexual Function

In addition to losing bowel and bladder function, Owen also lost sexual function.  Tr. 34.  Owen has only been able to get an erection a few times since his surgery and only achieved climax once.  Red Wing testified that she and

15

Owen were able to have intercourse one time after August 2001, which resulted in the conception of their youngest child. Tr. 35-36. Owen was able to get an erection two other times after taking Viagra, but he did not have any feeling or sensation and did not experience an orgasm. Tr. 65. Owen and Red Wing have chosen not to use Viagra since then. Tr. 46-47, 65. Owen and Red Wing engage in foreplay but do not have intercourse. Tr. 48. Owen is able to do some things that satisfy Red Wing's sexual desires, but he is unable to achieve climax himself. Tr. 38. It is very difficult for Owen and Red Wing to talk about their sexual frustrations to other people. Tr. 38.

### C. Emotional Difficulties

Owen also struggled emotionally after losing bladder, bowel, and sexual function. Red Wing testified that Owen became angry and sad and that their relationship grew apart. Tr. 37. Owen testified that he was full of anger at Dr. Weiffenbach in the months after his surgery. Tr. 66. He took out his anger on Red Wing and their children even though he was mad at someone else. Tr. 67. Red Wing moved out in December 2002 and engaged in an extramarital affair from December 2002 to May 2003. Tr. 44. Owen and Red Wing divorced in 2003, but got back together later that year. Tr. 37. Red Wing moved back in with Owen in May 2003. Tr. 45. They got back together because Owen accepted his bladder, bowel, and sexual dysfunction. Tr. 37. Red Wing

testified that she and Owen have found a way to have a loving relationship and are a lot closer than they were before 2001. Tr. 54.

## IV. Credibility of Witnesses and Evidence

Because many of the court's conclusions of law depend on which expert and treating physicians' opinions are given more weight, the court will discuss the credibility it gives to the testimony of each witness.

### A. Dr. Weiffenbach

Dr. Weiffenbach was in private practice in Florida for twenty years. Dep. Tr. 33. He maintained a general practice for ten years and worked in an emergency room for ten years. Dep. Tr. 33-34. Dr. Weiffenbach retired from the practice of medicine three years prior to trial due to health reasons. Tr. 14.

Dr. Weiffenbach does not remember treating Owen, but he testified about his notations on Owen's medical records. When asked about the duty or standard of care owed to a patient, Dr. Weiffenbach did not understand the meaning of the phrases "duty of care" or "standard of care." Dep. Tr. 35-36. He testified that he gave the best care that he could give under the circumstances. Dep. Tr. 36.

The court does not find Dr. Weiffenbach's testimony about the nature of Owen's injuries and the treatment he provided credible. In a video deposition taken on August 5, 2008, Dr. Weiffenbach struggled to remember his own personal address. Dep. Tr. 5. He also struggled to remember the medications

he was taking.  Dep. Tr. 7-10.  Dr. Weiffenbach could not identify the nerve roots affected when a patient has weak dorsiflexion.  Dep. Tr. 38-39.  Even though Dr. Weiffenbach's deposition was taken about seven years after he treated Owen, the court finds that Dr. Weiffenbach's lack of memory and inability to specifically refer to the affected nerve roots at his deposition undermines his credibility.  Therefore, the court does not give any weight to Dr. Weiffenbach's testimony about the appropriate treatment for back pain and the difference between and categorization of urgencies and emergencies.

### B.    Dr. Sabow

Dr. Sabow's education and background make him a qualified expert witness.  Dr. Sabow began practicing neurology in 1972.  Tr. 112.  He was the first practicing neurologist in South Dakota.  Tr. 112.  Dr. Sabow did his undergraduate work at the Virginia Military Institute and Georgetown University.  Tr. 112.  He was accepted into Jefferson Medical College at Thomas Jefferson University after his third year of college.  Tr. 112.  After graduating from medical school in 1967, Dr. Sabow completed fellowships at the University of Pittsburgh and the University of Minnesota.  Tr. 112.  He did his residency in neurology at the Minnesota Health Science Center, which is part of the University of Minnesota.  Tr. 112-13.  Dr. Sabow maintained a private practice and consulting neurology practice until 1999, when he retired from active hospital practice because of his own injuries and surgeries.  Ex. 2; Tr.

196.  Dr. Sabow continues to see patients at his home office, but he does not have hospital admission privileges.  Tr. 196-97.

The United States suggests that Dr. Sabow's testimony should be discredited because he is biased in favor of plaintiffs and against the government.  Dr. Sabow has been providing testimony in medical malpractice cases since he started practicing in 1972.  Tr. 195.  He has testified in five to seven cases on behalf of parties represented by the law firm representing Owen.  Tr. 201-02.  Dr. Sabow testifies in cases all over the United States.  Tr. 201-02.  He typically testifies for the plaintiff, but he has testified for the defense in several cases.  Tr. 202-03.  He has testified adversely to specialists in a variety of fields, including fields in which he did not practice.  Tr. 219-20. Dr. Sabow has also testified on the behalf of criminal defendants in federal criminal cases.  Tr. 222-23.

The court does not find that Dr. Sabow's testimony is inherently unreliable or incredible due to bias because Dr. Sabow has been hired by law firms all over the country, not just the law firm representing Owen, Dr. Sabow has testified for the defense in several medical malpractice cases, and Dr. Sabow continued to practice medicine for over twenty-five years after he began providing expert testimony.  Dr. Sabow switched from the active practice of medicine to providing expert testimony in medical malpractice and criminal cases due to his own injuries and surgeries.  Moreover, the court finds any

potential bias to be irrelevant because Dr. Sabow's key opinions are logical and well-supported by medical evidence, as further explained below.

Dr. Sabow's expert opinion is that Dr. Weiffenbach should have realized on July 22 that Owen was suffering from a central disc herniation, he should have referred Owen to a neurologist for further testing and treatment immediately, and that Dr. Weiffenbach's failure to do so was a breach of the standard of care and caused Owen to suffer permanent bladder, bowel, and sexual dysfunction. The court finds this opinion to be credible.

Dr. Sabow testified that Dr. Weiffenbach's observations of Owen's condition on July 22 should have indicated that Owen was suffering from a central disc herniation that, left untreated, could lead to cauda equina syndrome. Dr. Sabow testified that Owen's complaint that it was difficult to lift his right foot and that his right leg was numb should have indicated that Owen was experiencing a compressed nerve, rather than a pinched nerve or sciatica. Tr. 122. Difficulty lifting the foot and numbness are classic symptoms of compression of L5. Tr. 122. A pinched nerve or back strain would not cause pain that radiates down the leg and weakness of the leg. Tr. 122. These symptoms are caused by a ruptured disc with compression. Tr. 122.

Further, Dr. Sabow interpreted Dr. Weiffenbach's notation of "[d]ifficult flexion, somewhat weak dorsiflexion of right foot," as indicating two different actions of the foot: plantar flexion and dorsiflexion. Tr. 335. Dr. Sabow

20

explained that "plantar flexion" refers to the ability to point the foot downward. Tr. 123, 334.  He testified that when the word "flexion" is used without a modifier, it is automatically interpreted as "plantar flexion." Tr. 327.  Flexion is subserved by S1.  "Dorsiflexion," or "extension," refers to the ability to cock up the foot.  Tr. 123.  Extension is subserved by L5.  Tr. 123.

Dr. Wellman, expert for the United States, disagreed with Dr. Sabow's interpretation of the July 22 record.  Dr. Wellman testified that it was impossible to know what Dr. Weiffenbach meant by "[d]ifficult flexion."  Tr. 343.  As a practicing neurosurgeon who specializes in brain surgery, he could not assume that another physician who wrote "flexion" meant "plantar flexion." Tr. 343-44.  Dr. Wellman also testified that every joint in the body can flex.  Tr. 347.  Because Dr. Weiffenbach kept such poor records, it is difficult to tell whether Dr. Weiffenbach was referring to flexion of the foot or of another joint like Owen's knee, toe, or hip flexor.  Tr. 347.

Though the court agrees with Dr. Wellman that Dr. Weiffenbach's notes are difficult to decipher, the court finds that it is more likely than not that Dr. Weiffenbach was referring to two separate motions of Owen's right foot. The full clause reads, "Difficult flexion, somewhat weak dorsiflexion of right foot."  Ex. 1, USA 403A.  The use of a comma between the descriptions of "flexion" and "dorsiflexion" suggests that they are two different things, but the fact that the two descriptions are within the same clause suggests that they

both refer to the movement of Owen's right foot. Dr. Wellman testified that every joint of the body can flex, but his testimony suggests that there are two flexion functions of each joint: extension (dorsiflexion) and flexion (plantar flexion). Thus, the court finds Dr. Sabow's testimony that Dr. Weiffenbach observed weak extension and weak flexion credible.

The court also finds Dr. Sabow's opinion that Dr. Weiffenbach should have recognized on July 22 that Owen was likely to end up with cauda equina syndrome credible. Dr. Sabow testified that difficulty in both extension (involving L5) and flexion (involving S1) indicates that there is a central disc protrusion or rupture because there are two nerves involved. Tr. 123-24. In order for both nerves to be affected, the disc herniation must be centrally located rather than laterally located. Tr. 124. Indeed, Dr. Wellman agreed that if Owen had weakness in the L5 and S1 distribution, it would be much more likely that Owen had a central disc herniation. Tr. 309. Finally, Dr. Sabow testified, when there is a central disc herniation, there is a greater chance of the patient ending up with cauda equina syndrome if no action is taken. Tr. 124. Because Dr. Wellman agreed with Dr. Sabow that the presence of both weak extension and weak flexion suggest a central disc herniation, the court finds Dr. Sabow's conclusion that Dr. Weiffenbach should have recognized the likelihood of cauda equina syndrome to be credible.

Dr. Sabow also testified that Dr. Weiffenbach's failure to recognize the significance of difficulty in both extension and flexion on July 22 caused Owen's permanent injuries. The court finds this opinion credible because it is supported by medical reasoning and by Dr. Wellman's agreement that cauda equina syndrome is a neurosurgical emergency that should be treated immediately. Dr. Sabow testified that Dr. Weiffenbach breached the standard of care on July 22 by failing to immediately refer Owen to a neurologist or neurosurgeon or to order diagnostic tests. Tr. 128. Dr. Weiffenbach could have ordered several tests on July 22—a lumbosacral spine x-ray, an MRI, a CT, or a myelogram—but failed to do so. Tr. 128. Dr. Sabow testified that, as a neurologist, if a patient with pain radiating to the right foot, difficulty lifting the right foot, and difficult flexion and weak dorsiflexion of the right foot had been referred to him, he would have ordered an immediate MRI. Tr. 161. If an MRI could not be performed, Dr. Sabow would have performed a CT and a myelogram. Tr. 161. Further, Dr. Sabow testified, if Owen had received one of these tests, the complete stenosis of his spinal canal that was apparent in the CT and myelogram performed at MeritCare on August 2 would have been detected. Tr. 162-63. Then Owen would have received a decompressive laminectomy, the same surgery he later had at MeritCare. Tr. 163, 329-30. Dr. Sabow opined that if Owen had received this surgery on July 22, he would not have developed any bladder, bowel, or sexual dysfunction. Tr. 164.

The court finds that Dr. Sabow's opinion that Dr. Weiffenbach should have referred Owen to a neurologist or ordered an immediate MRI, CT, or myelogram is credible because it is consistent with the treatment Owen received when Dr. Van Peursem suspected an L5/S1 nerve injury when Owen presented at Coteau.  See Ex. 1, USA 11A.  Dr. Van Peursem told Dr. Weiffenbach that Owen needed to be transferred to MeritCare for an MRI and an orthopedic referral.  Id.  When Owen got to MeritCare, he was first sent for an MRI, but was too big to fit into the scanner, and then was sent for a CT and a myelogram.  Ex. 101, USA 87.

Dr. Wellman disagreed with Dr. Sabow's testimony that Dr. Weiffenbach should have ordered an MRI, CT, or myelogram on July 22, but the court finds that Dr. Wellman's testimony does not undermine Dr. Sabow's opinion. Dr. Wellman testified that he would not have recommended a myelogram for a patient for someone with Owen's symptoms because a myelogram is an invasive procedure that involves injecting dye into the patient's spinal cord.  Tr. 304.  A myelogram can cause adverse reactions and spinal fluid leak.  Tr. 304. But Dr. Wellman's testimony was based on his reading of the July 22 record as indicating something less severe than a central disc herniation, a reading the court finds is less likely than Dr. Sabow's reading.  The court credits Dr. Wellman's testimony that a myelogram is an invasive and risky procedure, but finds that the fact that Owen underwent a myelogram at MeritCare when a

L5/S1 nerve injury was suspected shows that the risks were outweighed by the seriousness of Owen's condition. Further, Dr. Wellman testified that he would not recommend a CT scan because you cannot see soft tissue like a disc herniation very well on a CT scan. Tr. 321. The court credits Dr. Wellman's testimony, but finds more convincing Dr. Sabow's testimony that while CTs have been replaced by MRIs as the gold standard for scanning for disc abnormalities, CTs were used for years before the advent of the MRI procedure and provided physicians with helpful information. See Tr. 331-32. Despite the risks and shortcomings of myelograms and CTs, given what Dr. Weiffenbach observed on July 22, he should have ordered these tests if an MRI could not be performed.

The court also accepts Dr. Sabow's opinion that if Owen underwent appropriate testing on July 22, that testing would have revealed a block of the spinal canal. He testified that in 97 percent of cases involving a patient with symptoms like Owen had on July 22, the patient has a herniated disc fragment or significant narrowing of the spinal canal from a bulging disc. Tr. 162. As noted, Dr. Wellman agreed that where both S1 and L5 are involved, a central disc herniation is much more likely. And, given the fact that Owen underwent a decompressive laminectomy within hours of the CT and myelogram at MeritCare, the court finds credible Dr. Sabow's testimony that if a block of the

spinal canal were discovered on July 22, Owen would have had surgery before August 2.

Finally, the court accepts Dr. Sabow's opinion that Owen's outcome would have improved if he had undergone surgery on July 22 rather than August 2. Dr. Sabow testified that time is crucial when there is compression of the nerves. Tr. 117. When a nerve is compressed, the tiny blood vessels that are necessary for the oxygenation and life of the nerve are compressed. Tr. 117. Failure to relieve the compression results in death of the nerve. Tr. 117. Compression of the nerve also compresses axoplasmic flow, which cuts off the conveyance of nutrients through the length of the nerve resulting in degeneration of the nerve. Tr. 118. Thus, the nerve dies unless the compression is relieved. Tr. 118. And, if the pressure on the affected nerves is not treated, other nerves will be affected, namely the sacral nerves that go to the organs of the pelvis and the perineum. Tr. 205-06. Therefore, Dr. Sabow testified that if the early symptoms of cauda equina syndrome are left untreated, the patient will have irreversible problems. Tr. 207.

Dr. Sabow testified that if action is taken to decompress the nerve within hours after the diagnosis of cauda equina syndrome, there is a chance of improvement or complete reversal of the compression of the nerve. Tr. 119. He testified that the gold standard in a case of cauda equine syndrome is to get the patient into surgery within twenty-four hours. Tr. 206. But this does not mean

that irreversible cauda equina syndrome will occur if the nerves are not decompressed within twenty-four hours of the first sign of compression because cauda equina syndrome is a dynamic situation. Tr. 204-05. If Owen had been referred for a neurological evaluation or further testing on June 22 and undergone a decompressive laminectomy within the next day, the pressure on the affected nerves would have been relieved about ten days sooner, before Owen developed bladder, bowel, or sexual dysfunction. Dr. Sabow's reasoning that action should be taken to correct the symptoms of cauda equina syndrome as soon as possible is supported by sound medical reasoning and the testimony of Dr. Wellman that cauda equina syndrome is a neurosurgical emergency and requires urgent and definitive care. See Tr. 296. Thus, the court finds credible Dr. Sabow's conclusion that Dr. Weiffenbach's failure to comply with the standard of care on July 22 caused Owen to sustain permanent injuries.

### C. Dr. Wellman

Dr. Wellman is qualified as an expert witness. He graduated from medical school in 1993 and completed a six-year residency in neurosurgery at the University of Iowa in 1999. Tr. 279; Ex. 103. Dr. Wellman began practicing as an independent neurosurgeon in July 1999. Tr. 280. He specializes in neurosurgery and performs 200 to 400 surgeries a year. Tr. 280-81, 283. Dr. Wellman became board-certified in neurosurgery in November

2002. Tr. 280. To become board-certified, Dr. Wellman had to gather two years of surgical and nonsurgical cases and then sit for an oral examination or interview with senior physicians in the neurosurgery field. Tr. 280. Thus, the court finds that Dr. Wellman has the experience and education to render sound conclusions in this case.

But the court does not find credible Dr. Wellman's opinion that Dr. Weiffenbach acted within the standard of care prior to August 1, that Owen first presented with symptoms of cauda equina syndrome on August 1, and that Dr. Weiffenbach's negligence on the evening of August 1 did not cause Owen's permanent injuries. Dr. Wellman's opinion relies on a reading of the July 22 record that the court has rejected, fails to consider the testing Dr. Weiffenbach should have done, and fails to take into account the dynamic process of Owen's condition.

Dr. Wellman opined that Owen's symptoms at his July 22, July 27, and July 28 visits to the IHS hospital were consistent with a condition called radiculopathy. Dr. Wellman testified that there was nothing in the July 22 record that indicated that Owen had cauda equina syndrome at the time. He testified that the definition of cauda equina syndrom is an acute change resulting in urinary retention, and Owen did not complain of urinary retention on July 22. Tr. 287. Dr. Wellman testified that Owen's symptoms sounded like a lumbar disc herniation causing a radiculopathy. Tr. 287. With respect

to Dr. Weiffenbach's notation that Owen had difficulty lifting his right foot and somewhat weak dorsiflexion of the right foot, Dr. Wellman testified that this symptom did not indicate cauda equina syndrome because about 25 percent of people with a radiculopathy have weakness and 50 percent have numbness. Tr. 288. Dr. Wellman testified that the treatment Owen received—analgesics, relaxants, and activity limitation—was appropriate. Tr. 289.

The court finds Dr. Wellman's interpretation of the July 22 record as indicating simple radiculopathy is not credible. Dr. Wellman's reading of the July 22 record glosses over Dr. Weiffenbach's notation of "[d]ifficult flexion, somewhat weak dorsiflexion of right foot." See Ex. 1, USA 403A. As previously discussed, the court finds Dr. Sabow's interpretation of the record as indicating impairment of two functions involving both S1 and L5 more likely true than not true. Given the apparent involvement of two nerves, S1 and L5, Dr. Wellman's conclusion that analgesics, relaxants, activity limitation, and instructions to return to the clinic in one week constituted appropriate treatment is not credible. As Dr. Sabow explained, Dr. Weiffenbach should have ordered an immediate referral for neurologic evaluation and testing because it was apparent that Owen had a central disc herniation which required immediate attention. The court also finds Dr. Wellman's opinion that Owen did not have cauda equina syndrome on July 22 because he did not have the classic

symptom of urinary retention overly simplistic for the reasons further stated below.

Dr. Wellman also testified that Owen's symptoms at both visits on July 27 indicated that he suffered from radiculopathy but not cauda equina syndrome. First, Dr. Wellman testified that Owen's complaints at his 12:27 a.m. visit—lower back pain, right leg pain, and numbness—indicated radiculopathy. Tr. 289. Dr. Wellman testified that it fell within the standard of care to instruct Owen to return in the morning. Tr. 291. Second, Dr. Wellman testified that Owen's complaints at 9:31 a.m.—pain down the right leg starting in the right buttock—provide further evidence that Owen had a lumbar disc herniation resulting in radiculopathy. Tr. 292. Dr. Wellman also noted that Dr. Weiffenbach indicated, "no footdrop." Dr. Wellman testified that Dr. Weiffenbach could have observed whether Owen had foot drop by watching Owen walk because footdrop is easily appreciated when a person is walking. Tr. 292. As with July 22, Dr. Wellman testified that Dr. Weiffenbach correctly diagnosed Owen on July 27. Tr. 293.

The court finds that Dr. Wellman's opinion that Dr. Weiffenbach correctly treated Owen on July 27 based on the symptoms listed in the record is not credible because Dr. Wellman did not consider whether Dr. Weiffenbach conducted a thorough examination of Owen. Indeed, Dr. Sabow testified that there was nothing in the record of the 9:31 a.m. visit indicating that

Dr. Weiffenbach performed an actual examination testing for strength, reflexes, sensation, or rectal tone. Tr 168. With respect to Dr. Weiffenbach's notation of "no footdrop," Dr. Sabow testified that a patient may have footdrop even if it is not apparent by watching the patient walk. Tr. 230-31. Thus, Dr. Sabow would expect a physician to test for footdrop by having the patient walk on his toes, walk on his heels, and attempt to resist the physician's efforts to push his foot from an extended position to a pointed position. Tr. 256-57. Dr. Wellman and Dr. Sabow agree that physicians are trained to document the tests they perform, and that if a test is not documented, then it can be assumed that the test was not done. Tr. 263-64, 325. Dr. Wellman did not testify that Dr. Weiffenbach performed an adequate examination or conducted all of the appropriate tests, but rather that Dr. Weiffenbach made the appropriate diagnosis based on the observations recorded in the July 27 records.

The court finds compelling Dr. Sabow's testimony that Dr. Weiffenbach should have performed testing for foot drop, strength, reflexes, sensation, and rectal tone. Thus, Dr. Wellman's opinion that Dr. Weiffenbach appropriately diagnosed and treated Owen on July 27 based on the observations recorded in the medical record is not convincing because Dr. Weiffenbach did not do the appropriate tests to determine whether Owen had additional symptoms that would indicate that he was likely to develop cauda equina syndrome.

Dr. Wellman testified that Owen presented with symptoms of radiculopathy, not cauda equina syndrome, on August 28. See Tr. 293. This opinion suffers from the same shortcomings as Dr. Weiffenbach's opinion regarding the July 27 visits. There is no indication that Dr. Cropp performed the type of examination necessary to determine if Owen needed to be referred for more diagnostic treatment. Thus, the court finds that Dr. Wellman's opinion that Owen did not have cauda equina syndrome and did not need to be referred for diagnostic treatment on July 28 is not credible.

Overall, Dr. Wellman testified that there was nothing in the July 22, July 27, and July 28 records indicating that Owen had cauda equina syndrome because the phrase "cauda equina syndrome" means an acute change resulting in urinary retention, and Owen did not present with urinary retention until the evening of August 1. The court finds Dr. Wellman's description of cauda equina syndrome accurate as to classical, or clinical, cauda equina syndrome, but does not find the absence of urinary retention before August 1 dispositive of Owen's condition at the time.

Dr. Wellman testified that the onset of cauda equina syndrome is a sudden change. Tr. 307. While it is possible for a patient to have gradual cauda equina syndrome, this would be very unusual because cauda equina syndrome is an acute problem. Tr. 307. Dr. Wellman opined that the popping or cracking sound Owen heard after getting a massage on July 31 signified the

beginning of his cauda equina syndrome. Tr. 297. Dr. Wellman testified that the sound was most likely caused by a big disc herniation coming out and causing the onset of cauda equina syndrome. Tr. 322. Dr. Wellman cannot identify the cause of the pop, but testified that the sound was a feeling or sensation of things worsening. Tr. 322. Several of Dr. Wellman's patients have reported that they heard a popping sound associated with a disc herniation. Tr. 323. Dr. Wellman opined that because Owen's cauda equina syndrome did not begin until July 31, he did not present at the IHS hospital with cauda equina syndrome until he presented with urinary retention on August 1. Tr. 307.

The court finds that Dr. Wellman's opinion that Owen did not fit within the definition of cauda equina syndrome until July 31 or August 1 is credible, but finds that Dr. Wellman's testimony that the condition occurred suddenly is not credible. Rather, the court finds Dr. Sabow's testimony that cauda equina syndrome is a dynamic process to be more compelling. Dr. Sabow testified that while clinical, full-blown cauda equina syndrome occurs suddenly when the patient loses control of the bladder, the pathology itself evolves. Tr. 328-29. He explained,

> [t]he definition of certain syndromes are described in certain ways so that there is an understanding of exactly what a full-blown picture would look like. But before a full-blown, almost an irreversible, say, syndrome occurs, there to the expert are all the signs and symptoms that the physician understands, so that the full-blown book definition doesn't quite take place. . . . Physicians

are—our job is to identify the symptoms that lead up to a full-blown irreversible book definition of cauda equina syndrome.

Tr. 207-08. Dr. Sabow cannot identify the exact minute or hour at which cauda equina syndrome occurs. Tr. 206-07.

Dr. Sabow agreed with Dr. Wellman that in Owen's case, the classic symptoms of cauda equina syndrome appeared on August 1, when Owen first lost control of his bladder. Tr. 212. But Dr. Sabow testified that the classic symptoms developed over several days. Tr. 214. Dr. Sabow explained that Owen wet himself on the morning of August 1 because he had overflow incontinence, meaning that his bladder was so full that it could not expand anymore, and the urine just leaked out. Tr. 214. Dr. Sabow testified that Owen's bladder became irritated as a result of pressure on the sacral nerves beginning on July 23, 24, or 25, and the build-up of urine began about three days before Owen finally wet himself. Tr. 214.

The court finds Dr. Sabow's explanation of the development of cauda equina syndrome more credible than Dr. Wellman's explanation that the syndrome occurred suddenly when Owen heard a popping or cracking sound in his buttock. Dr. Sabow's explanation accounts for the 1,200 to 1,500 cc's of urine that were removed from Owen's bladder at Coteau on August 1. This amount of urine, two to three times the capacity of a normal adult male bladder, developed over a period of days before Owen's bladder finally became overdistended and Owen lost control of his urinary functions. Dr. Wellman's

34

theory that Owen got cauda equina syndrome suddenly does not explain how Owen experienced overflow incontinence the morning of August 1.

Dr. Sabow also offered an alternative explanation of the popping or cracking sound Owen heard some time after his massage on July 31. He testified that it was 99.9 percent probable that the sound Owen heard was the sound of one facet joint slipping over another facet joint, the same sound a person hears when he cracks his knuckles. Tr. 251. Dr. Sabow also testified that it was very unlikely that the popping or cracking sound Owen heard was the sound of the disc material completely separating from the normal disc. Tr. 250. The court finds Dr. Sabow's explanation of the sound more credible than Dr. Wellman's explanation because Dr. Sabow's explanation is more consistent with Owen's description of the popping or cracking sound. Owen testified that he heard the sound in his buttock but did not feel any sensation associated with it. Tr. 70, 109. Dr. Wellman testified that the popping or cracking sound was likely a "feeling or sensation of things worsening." Tr. 322. Under Dr. Wellman's theory, Owen should have experienced some change in sensation associated with the sound, but he explicitly denied feeling anything. Thus, the court finds that Dr. Sabow's explanation of the popping or cracking sound is more credible, and as a result, the court finds that Dr. Wellman's opinion that Owen's cauda equina syndrome began suddenly when he heard the sound is not credible.

Finally, the court finds that Dr. Wellman's opinion that Dr. Weiffenbach's treatment of Owen did not cause Owen's permanent injuries is not credible. Dr. Wellman admits that Owen's urinary problems on August 1 were a clear red flag that he had cauda equina syndrome at this point. Tr. 295. Dr. Wellman testified that Dr. Weiffenbach's instruction to Owen to return to the clinic in the morning fell below the standard of care because cauda equina syndrome is a neurosurgical emergency and requires urgent and definitive care. Tr. 296. But Dr. Wellman opined that Dr. Weiffenbach's failure to comply with the standard of care did not cause Owen's lasting injuries because Dr. Weiffenbach's failure to recognize Owen's condition as cauda equina syndrome on August 1 only caused a few-hour delay in Owen undergoing a decompressive laminectomy. Tr. 304. Dr. Wellman testified that the total lapse of time between when Owen developed cauda equina syndrome on July 31 and when Owen underwent surgery at MeritCare included the time before Owen initially went to the IHS hospital, the time it took for Owen to go to Coteau, the time it took for Owen to be transported from the IHS hospital to MeritCare, the time it took for diagnostic testing at MeritCare, and the time that passed before Owen actually went into surgery. Tr. 304-05. Dr. Wellman could not say that the time that elapsed between when Owen initially presented at the IHS hospital and when Owen returned to the IHS hospital to be transported to MeritCare caused his lasting injuries. Tr. 305. He testified that

Dr. Weiffenbach's several-hour delay in referring Owen to MeritCare on the evening of August 1 did not change the outcome for Owen.  Tr. 310.

Because the court rejected Dr. Wellman's testimony that Dr. Weiffenbach properly treated Owen in the week and a half before Owen presented with overflow incontinence on August 1, the court rejects Dr. Wellman's opinion that Dr. Weiffenbach's failure to refer Owen for neurological testing and treatment did not cause Owen to sustain permanent injuries.  The court credits Dr. Sabow's testimony that Dr. Weiffenbach should have recognized that Owen had a central disc herniation on July 22 and referred him for diagnostic treatment then, that Dr. Weiffenbach did not perform an appropriate examination on July 27 and July 28, and that the symptoms of cauda equina syndrome developed over time and did not occur suddenly on July 31.  As a result, the court finds Dr. Wellman's opinion that Dr. Weiffenbach was not negligent until the evening of August 1 and that this negligence did not cause Owen to sustain permanent neurologic injuries not credible.

### D.    Dr. Hoversten

Dr. Hoversten testified as a treating physician for Owen.  Based on his treatment of Owen, Dr. Hoversten testified that Owen has suffered a 55 percent impairment of total body functioning as a result of his cauda equina syndrome. The court finds that Dr. Hoversten's testimony is credible, but not useful in determining the extent of Owen's injuries and amount of damages, if any.

37

Dr. Hoversten attended the University of Colorado Medical School. Ex. 4. After graduating from medical school in 1973, he did a rotating internship at Fitzsimmons Army Medical Center and three years of general practice in the military in Germany. Tr. 130. He completed a four-year orthopedic residency at the Mayo Clinic in Rochester, Minnesota. Tr. 130. He has practiced orthopedic surgery since 1981. Tr. 129.

Dr. Hoversten saw Owen in 2003. He reviewed a packet of medical records covering the medical care Owen received leading up to and after his surgery, reviewed a back pain questionnaire and medical history provided by Owen, conducted an interview of Owen, and performed an examination. Tr. 133-34, 141-42. The medical records were provided by Owen's counsel and do not extend beyond 2003. Tr. 139-40. Dr. Hoversten did not conduct bladder or rectal examinations, but rather relied on the medical records to evaluate Owen's bladder function and bowel control. Tr. 134. Dr. Hoversten had Owen do toe walking, which showed weakness on his right foot, and heel walking, which showed moderate weakness of the right foot for dorsiflexion. Tr. 135. Dr. Hoversten also observed that Owen had overall weakness of the right buttock and a positive Trendelenburg while standing, which means that Owen's pelvis tipped the wrong way when he stood on one leg, indicating persistent weakness of some L5 muscles. Tr. 135. Dr. Hoversten also conducted reflex testing, which showed significantly diminished reflex of the

right ankle and mildly diminished reflex of the left ankle.  Tr. 135.  Finally,
Dr. Hoversten looked at the incision on Owen's low back.  Tr. 135.

Using the Fourth Edition of the American Medical Association Guide for
Evaluation of Permanent Impairment, Dr. Hoversten assessed Owen's
impairment rating.  Tr. 132-33.  An impairment rating is a number assigned by
the American Medical Association that approximates the effect of an injury on
bodily function.  Tr. 151.  Dr. Hoversten used the Diagnosis-Related Estimate
(DRE) approach and determined that Owen's impairment rating was 55
percent.  Tr. 136.

The court finds that Dr. Hoversten's testimony that Owen has a 55
percent impairment rating under the Fourth Edition of the Guide for
Evaluation of Permanent Impairment is credible.  There are some
inconsistencies between the facts in evidence and the facts Dr. Hoversten
reported in a record prepared on August 14, 2003, but these facts do not affect
the impairment rating under the DRE approach in the Fourth Edition.  The
August 2003 record indicates that Owen has "severe anal incompetence [sic]
. . . [and] fouling of his pants on a quite regular basis."  Ex. 5.  The record also
indicates that Owen had problems with recurrent bladder infections.  Ex. 5.
Owen testified that he stopped fouling his pants and using a catheter about six
months after the surgery.  Tr. 33, 62.  The August 2003 record also indicates
that Owen was doing dispatch at the time the record was prepared.  Ex. 5.

Owen testified that he worked dispatch for about six months after surgery and then switched back to patrol. Tr. 87. Finally, Dr. Hoversten's record indicates that Owen sustained his 2001 back injury by helping a person in a wheelchair. Ex. 5. Some of the medical records indicate that Owen initially hurt his back while lifting a refrigerator/freezer. Ex. 1, USA 403A. Owen testified that his injury was not work-related. Tr. 272.

Under the Fourth Edition of the Guide for Evaluation of Permanent Impairment, these factual inconsistencies are irrelevant. Under this edition, the impairment rating is determined by the injury itself and the patient's initial condition regardless of the results after treatment. Tr. 150. Thus, it is irrelevant under the Fourth Edition how Owen sustained the initial injury and whether his inability to control his bowels, occurrence of bladder infections, and difficultly doing patrol work improved after treatment. See Tr. 143.

But, the court finds that Owen's impairment rating under the Fourth Edition of the Guide for Evaluation of Permanent Impairment is not very helpful in assessing the extent of Owen's injuries. When Dr. Hoversten saw Owen in 2003, South Dakota used two editions of the Guide for Evaluation of Permanent Impairment: the Fourth Edition for worker's compensation cases and the Fifth Edition for non-worker's compensation cases. Tr. 147-49. Dr. Hoversten used the Fourth Edition in evaluating Owen's impairment rating because he thought that he was examining Owen for the purposes of a worker's

40

compensation claim.  Tr. 147.  Under the Fourth Edition, the impairment rating is determined by the injury itself and the patient's initial condition regardless of the results after treatment.  Tr. 150.  Cauda equina syndrome with severe bowel and bladder involvement, which must require internal or external assistive devices, is assigned a 55 percent impairment rating.  Tr. 156-57.  The catheters Owen used after surgery qualify as assistive devices, so under the Fourth Edition, Owen had severe bowel and bladder involvement and an impairment rating of 55 percent.  Tr. 158.

In contrast, under the Fifth Edition, which is used for non-worker's compensation cases, the impairment rating is determined by the patient's condition after treatment.  Tr. 148-50.  Dr. Hoversten testified that the Fifth Edition retains the DRE categories, so a rating under the Fourth Edition would probably not change under the Fifth Edition.  Tr. 150.  But, Dr. Hoversten would have to know the extent of bowel and bladder involvement after treatment in order to evaluate Owen's impairment rating under the Fifth Edition.  Dr. Hoversten testified that he would have to do a rectal strength sphincter test and a bladder cystometry to determine if Owen is able to empty his bladder in a normal fashion using external pressure on the abdomen in order to assess whether Owen's bowel and bladder impairments have recovered.  Tr. 160.

The court finds that Dr. Hoversten's testimony that Owen has a 55 percent impairment of total body functioning is not very useful for the following reasons. First, Dr. Hoversten came to this figure by using the wrong edition for a personal injury case brought against an IHS doctor. Second, this figure reflects the impairment Owen suffered immediately after his surgery and does not reflect any improvements he experienced or the long-term effects of his injuries. Third, Dr. Hoversten admitted that he would have to conduct more tests to determine Owen's impairment rating under the appropriate edition of the Guide for Evaluation of Permanent Impairment. Finally, the Guide for Evaluation of Permanent Impairment warns against placing too much weight on an impairment rating in determining damages: "[I]mpairment percentage is derived according to guides criteria [and] should not be used to make direct financial awards or direct estimates of disability." Tr. 153.

## DISCUSSION

Owen brings this medical malpractice claim under the FTCA. The FTCA waives sovereign immunity with respect to claims

> for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1). In an FTCA action arising out of alleged medical malpractice occurring at an IHS hospital located within the territory of an American Indian reservation, the court is bound to apply the law of the state in which the alleged malpractice occurred. LaFromboise v. Leavitt, 439 F.3d 792, 794 (8th Cir. 2006). Here, the IHS hospital was located on the Sisseton-Wahpeton Oyate reservation in South Dakota, so the court will apply South Dakota law.

## V.   Liability

### A.   Negligence of Dr. Weiffenbach

Owen claims that Dr. Weiffenbach acted negligently in treating his back and leg pain, numbness, and related symptoms. "Negligence is the breach of a duty owed to another, the proximate cause of which results in an injury." Pierce v. City of Belle Fourche, 624 N.W.2d 353, 356 (S.D. 2001). Under South Dakota law, medical professionals have a duty to "possess and apply 'that degree of learning and skill ordinarily possessed by [medical professionals] of good standing engaged in the same type of practice in the same or similar locality.' " Goodman v. United States, 2 F.3d 291, 293 (8th Cir. 1993) (quoting In re Yemmanur, 447 N.W.2d 525, 528 n.3 (S.D. 1989)). "Proximate or legal cause is a cause that produces a result in a natural or probable sequence and without which the result would not have occurred." Hertz Motel v. Ross Signs, 698 N.W.2d 532, 537 (S.D. 2005). A proximate cause does not need to be the

only cause of a result, but the harm suffered must be a foreseeable consequence of the act complained of. <u>Wuest ex rel. Carver v. McKennan Hosp.</u>, 619 N.W.2d 682, 689 (S.D. 2000).

Here, the court concludes that Dr. Weiffenbach breached his duty to possess and apply the degree of learning and skill ordinarily possessed by physicians in good standing engaged in the same type of practice in the same or similar locality. As Dr. Sabow testified, any medical professional, including an emergency room physician, with the level of training of a third- or fourth-year medical student should be able to identify the problems that may lead to cauda equina syndrome. Tr. 119-20. Further, Dr. Sabow testified that a physician who sees a patient with a condition the physician cannot treat himself has a duty to request appropriate consultation. Tr. 120. Indeed, it is generally recognized "that 'a physician's duty to advise his patients to consult a specialist . . . arises when the physician knows, or should know, that he does not possess the requisite skill, knowledge or facilities to properly treat a patient's ailment.' " <u>Dewes v. Indian Health Serv., Pub. Health Serv.</u>, 504 F. Supp. 203, 208 (S.D. 1980). Dr. Weiffenbach breached the duty of care on July 22 by failing to recognize that the presence of both weak flexion and weak extension indicated that Owen had a central disc herniation, and as a result was much more likely to develop cauda equina syndrome unless he was

treated.  Dr. Weiffenbach also breached his duty to refer Owen to a neurologist for further testing and treating.

The court notes that while the July 22 record does not indicate that Dr. Weiffenbach performed any tests, and Dr. Sabow was unable to say how Dr. Weiffenbach knew that Owen had difficult flexion and somewhat weak dorsiflexion without doing an examination, the fact that Dr. Weiffenbach recorded weakness of two separate functions is enough for the court to conclude that Dr. Weiffenbach should have recognized the involvement of two different nerves, the likelihood of a central herniation, and the risk of cauda equina syndrome.  Tr. 337-38.

And, the court concludes that Dr. Weiffenbach's failure to comply with the standard of care on July 22 proximately caused Owen's permanent bladder, bowel, and sexual dysfunction.  As Dr. Sabow testified, in 97 percent of cases involving a patient with symptoms like Owen's, the patient will have a herniated disc fragment or significant narrowing of the spinal canal from a bulging disc, abnormalities that would be detected by an MRI or myelogram.  Tr. 162.  Thus, the court finds that it is more likely than not that if Owen had undergone a myelogram on July 22, a central blockage of his spinal canal would have been detected and he would have undergone a decompressive laminectomy within the next day.

Further, based on Dr. Sabow's testimony, the court finds that if Owen had undergone this procedure within one day of his July 22 visit to the IHS hospital, he would not have sustained permanent bladder, bowel, and sexual dysfunction.  The court acknowledges Dr. Wellman's testimony that even when surgery is done right away after neurologic injury, sometimes people do not get better.  Tr. 305.  But Dr. Wellman also testified that on average, the longer the delay between neurologic injury and surgery, the less chance there is of recovery.  Tr. 305.  The court is persuaded by the fact that Owen had not experienced bladder, bowel, or sexual dysfunction on July 22 and by Dr. Sabow's testimony that if Owen were properly treated on July 22, he would not have sustained any permanent neurologic deficit, including no deficit of bladder or bowel function and no leg weakness or numbness.  Tr. 119.

Thus, Dr. Weiffenbach's failure to immediately order diagnostic testing or make a referral to a neurologist on July 22 was a significant factor in producing Owen's permanent injuries because Dr. Weiffenbach's inadequate treatment delayed surgical treatment by about ten days until after Owen had already developed loss of bladder and bowel function.  Owen's permanent bladder, bowel, and sexual dysfunction are common symptoms of cauda equina syndrome, and this syndrome was clearly foreseeable when Dr. Weiffenbach observed weakness of both flexion and extension, which indicated the involvement of two nerves and therefore a central blockage of the spinal

canal.  For these reasons, the court concludes that Dr. Weiffenbach's failure to order diagnostic testing or a referral to a neurologist on July 22 was a proximate cause of Owen's permanent injuries.  Thus, Dr. Weiffenbach was negligent.

**B.    Contributory Negligence**

The government claims that Owen was contributorily negligent in waiting to seek medical attention for more than twenty-four hours after losing bladder and bowel sensation and control.  The defense of contributory negligence is available in medical malpractice actions.  Dodson v. South Dakota Dep't of Human Servs., 703 N.W.2d 353, 356 (S.D. 2005).  "Contributory negligence is a breach of duty which the law imposes upon persons to protect themselves from injury, which concurring and cooperating with actionable negligence for which defendant is responsible, contributes to the injury complained of as a proximate cause."  Boomsma v. Dakota, Minnesota & Eastern R.R. Corp., 651 N.W.2d 238, 245-46 (S.D. 2002) (internal quotation and citation omitted), overruled on other grounds, State v. Martin, 683 N.W.2d 399 (S.D. 2004).  A person who is contributorily negligent may still recover damages if his contributory negligence was slight, or less than slight, when compared with the negligence of the defendant, but the damages must be reduced in proportion to the amount of the contributory negligence.  SDCL 20-9-2.

Here, the court concludes that Owen was not contributorily negligent. A person is negligent if he fails to use reasonable care by doing something which a reasonable person would not do, or fails to do something which a reasonable person would do, under similar facts. South Dakota Pattern Jury Instructions: Civil, § 20-20-10 (2008 ed.). It was not unreasonable for Owen to wait until the evening of August 1 to return to the IHS hospital. Owen had been to the IHS hospital four times in ten days, and each time he saw a physician, he was sent home and told to return to the clinic in one week. A reasonable person in these circumstances would not have reason to believe that he should return to the clinic immediately upon experiencing loss of bladder control. Also, Dr. Sabow testified that he would not expect a patient without medical training to understand the physiology of the bladder or to notice the loss of sensation in the bladder that occurs before incontinence begins. Tr. 215-18. Thus, a reasonable person in Owen's situation would not understand the significance of loss of bladder control or even notice a problem until he began to urinate on himself. Under these circumstances, the court concludes that Owen did not fail to use reasonable care in waiting until the evening of August 1 to go to the IHS hospital when he first noticed loss of bladder control that morning. Thus, Owen was not contributorily negligent.

## VI.    Damages

Owen seeks damages for disability and disfigurement as well as for pain and suffering and loss of capacity of the enjoyment of life experienced in the past and reasonably certain to be experienced in the future as a result of the injuries he sustained.  The court must determine the amount of money that will reasonably and fairly compensate Owen for these elements of loss or harm that were proximately caused by the conduct of Dr. Weiffenbach, taking into consideration the nature, extent, and duration of the injuries.  South Dakota Pattern Jury Instructions: Civil, § 50-00-10 (2008 ed.).

### A.    Damages Cap

South Dakota law imposes a $500,000 cap on general damages that may be awarded in a medical malpractice action against a physician or hospital. SDCL 21-3-11.  This cap applies to Owen's claim under the FTCA that Dr. Weiffenbach was negligent, so Owen's general damages may not exceed $500,000.  See Knowles v. United States, 91 F.3d 1147, 1149 (8th Cir. 1996) ("Where the negligence of the doctors, nurses, and hospital are concerned, [South Dakota's] cap indisputably applies."); see also Carter v. United States, 333 F.3d 791 (7th Cir. 2003) (applying state-law cap on noneconomic damages in FTCA case).  There is no cap on the amount the court may award for special damages.  SDCL 21-3-11.   Here, Owen only seeks, and the court only awards, general damages, so Owen's award is limited to $500,000.

### B. Disability and Disfigurement

Dr. Weiffenbach's conduct caused Owen to suffer permanent disability and disfigurement, namely, permanent loss of normal bladder, bowel, and sexual function. Owen cannot urinate or have a bowel movement through normal bladder or bowel sensation, but rather relies on intraabdominal pressure that does not entirely empty his bladder or colon. Owen also cannot maintain an erection or achieve an orgasm without the assistance of medication. Even when he takes medication, he does not experience sensation. These impairments are permanent. The court finds that an award of damages of $300,000 will reasonably and fairly compensate Owen for his disability and disfigurement.

### C. Pain and Suffering & Loss of Capacity of the Enjoyment of Life

Dr. Weiffenbach's conduct has also caused Owen to experience pain and suffering and loss of capacity of the enjoyment of life. Owen's bladder, bowel, and sexual dysfunction have caused him embarrassment and anger. His emotional struggles contributed to his temporary separation and divorce from Red Wing. Although he and Red Wing have reconciled, developed a stronger relationship, and plan to re-marry, Owen still cannot have a normal sexual relationship with Red Wing. The pain and suffering and loss of enjoyment of life that result from Owen's sexual dysfunction will continue into the future.

Owen has also suffered the embarrassment and humiliation of soiling his pants several times in his police car. Although he has regained control of his bowels, he still has to live with the fact that he cannot sense an urge to urinate or defecate until his bladder or bowels are so full that they create pressure on his other organs. The pain and suffering associated with Owen's loss of bladder and bowel function will also continue into the future, as Owen is reasonably certain to develop additional conditions as a result of his inability to void his bladder and bowels normally, namely hydroephrosis and infected cysts in the kidneys, diverticulitis, and hemorrhoids.

The court finds that an award of damages of $200,000 will reasonably and fairly compensate Owen for the pain and suffering and loss of capacity of the enjoyment of life he has experienced in the past and is reasonably certain to experience in the future.

### D. Offset by Federal Benefits

The United States argues that because Owen is eligible for benefits through the United States Department of Veterans Affairs, his damages award should be offset by the amount receives in federal benefits because the United States is both the source of the benefits and the defendant tortfeasor in this case. Under the collateral source rule, "[t]otal or partial compensation received by an injured party from a collateral source, wholly independent of the wrongdoer, does not operate to reduce the damages recoverable from the

wrongdoer." Kostel v. Schwartz, 756 N.W.2d 363, 389 (S.D. 2008). Several courts have held that aid provided by the United States may be offset from an award for medical expenses and housing care in FTCA cases where the United States is the defendant, notwithstanding the collateral source rule. See Overton v. United States, 619 F.2d 1299, 1305-09 (8th Cir. 1980); Anderson v. United States, 731 F. Supp. 391, 400-02 (D.N.D. 1990). But, the United States has not cited, and the court is unaware of, any cases in which an award for general or noneconomic damages is offset by federal benefits.

Here, Owen is eligible for federal VA benefits, and the defendant tortfeasor is the United States, so the exception to the collateral source rule may apply. See Tr. 82. But the court has only awarded damages for disability and disfigurement, pain and suffering, and loss of enjoyment of life. These are general damages, not special damages. Morever, unlike in Overton and Anderson, where the federal benefit in question compensated the plaintiff for part of his medical expenses and housing care, here there is no evidence that Owen's VA benefits have compensated him for his disability and disfigurement, pain and suffering, and loss of capacity of the enjoyment of life. Under these circumstances, the court's award of damages to Owen will not be offset by his federal benefits.

## VII. Conclusion

The court finds that the United States is liable to Owen for negligence in the amount of $500,000.  Judgment shall be entered accordingly.

Dated July 31,  2009.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE